



PLAINTIFFS'
MOTION FOR
SUMMARY
JUDGMENT

memorex.   DVD+R
16X 4.7GB 120min

EXHIBIT 3

- VIDEO -



PLAINTIFF'S
EXHIBIT
3





# Transcript of the Testimony of
# **Salvatore Reale**

October 12, 2016

James Sizer, Sr., Deceased, by and through heirs Dorothy Sizer, et al. v. Officer Martha Cameron, et al.

Givens Court Reporting
(512) 301-7088
sandy@givenscourtreporting.com



PLAINTIFF'S EXHIBIT
5
tabbies

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JAMES SIZER, SR., Deceased,  §
by and through heirs DOROTHY  §
SIZER, CAROLINE WOLFF,  §
and JAMES SIZER, JR.,  §
Individually,  §
　§
　Plaintiffs,  § CIVIL ACTION NO.
　§ A15-CV-1143-SS
v.  §
　§
OFFICERS MARTHA CAMERON  §
and S. REALE, Individually,  §
CITY OF AUSTIN, TEXAS,  §
　§
　Defendants.  §

* * * * * * * * * * * * * * * * * *

THE ORAL DEPOSITION OF

CORPORAL SALVATORE REALE

October 12, 2016

* * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF CORPORAL SALVATORE REALE
produced as a witness at the instance of the Plaintiffs
and duly sworn, was taken in the above styled and
numbered cause on October 12, 2016, from 9:38 a.m. to
12:01 p.m., before Sandra S. Givens, CSR, in and for
the State of Texas, reported by machine shorthand
method, at City Hall, 301 W. 2nd Street, 4th Floor,
Austin, Texas, pursuant to the Federal Rules of Civil
Procedure.

Page 1

---

## A P P E A R A N C E S

**FOR THE PLAINTIFFS:**
Mr. Bobby R. Taylor
Law Offices of Bobby R. Taylor
1709 E. Martin Luther King, Jr. Blvd.
Austin, Texas 78702
(512) 476-4886
bobby@taylor-law.com

**FOR THE DEFENDANTS:**
Ms. Chris Edwards
Assistant City Attorney
Ms. Kim Ohrn
Law Clerk
City of Austin
P.O. Box 1546
Austin, Texas 78767-1546
(512) 974-2419
chris.edwards@austintexas.gov

ALSO PRESENT:

Ms. Caroline Wolff
Ms. Dorothy Sizer

Page 2

---

I N D E X

Appearances - - - - - - - - - - - - - - - - - - - - 2
Exhibits - - - - - - - - - - - - - - - - - - - - - 3
CORPORAL SALVATORE REALE
　Examination by Mr. Taylor - - - - - - - - - - - 5
Changes and Signature - - - - - - - - - - - - - - 108
Reporter's Certification - - - - - - - - - - - - 110

E X H I B I T S

NO.  DESCRIPTION                                   PAGE

Exhibit 1 - - - - - - - - - - - - - - - - - - -  33
　Record of Corporal Reale's 3/6/15 Download of
　TASER Information (TASER user not identified)

Exhibit 2 - - - - - - - - - - - - - - - - - - -  43
　DVD of Corporal Reale's DMAV
Exhibit 3 - - - - - - - - - - - - - - - - - - -  43
　Corporal Reale's TCOLE Records of Training
　Courses Taken
Exhibit 4 - - - - - - - - - - - - - - - - - - -  44
　Corporal Reale's 2013 - 2015 Classes or
　Update Records
Exhibit 5 - - - - - - - - - - - - - - - - - - -  47
　Record of Corporal Reale's Various Training
　Courses 1989 - 2015
Exhibit 6 - - - - - - - - - - - - - - - - - - -  52
　Screenshot of Corporal's Reale 3/9/15 Interview
　with SIU
Exhibit 7 - - - - - - - - - - - - - - - - - - -  53
　DVD of Corporal Reale's 3/9/15 Interview
　with SIU (DVD Retained by Attorney)

Page 3

---

Exhibit 8 - - - - - - - - - - - - - - - - - - -  53
　Transcript of Corporal Reale's 3/9/15
　Interview with SIU
Exhibit 9 - - - - - - - - - - - - - - - - - - -  53
　Transcript of Corporal Reale's 3/10/15
　Interview with IA
Exhibit 10 - - - - - - - - - - - - - - - - - - -  55
　Corporal Reale's 3/6/15 General Offense
　Hardcopy, Supplemental
Exhibit 11 - - - - - - - - - - - - - - - - - - -  93
　APD Policy: Response to Resistance (PowerPoint)
Exhibit 12 - - - - - - - - - - - - - - - - - - -  95
　U.S. Code, Title 42, Section 1986, Action
　for Neglect to Prevent (PowerPoint)
Exhibit 13 - - - - - - - - - - - - - - - - - - -  96
　Duty to Stop Others (PowerPoint)
Exhibit 14 - - - - - - - - - - - - - - - - - - -  97
　3 Keys to Understanding the "Reasonableness
　Standard" (PowerPoint)
Exhibit 15 - - - - - - - - - - - - - - - - - - -  100
　DRRM Response to Resistance PowerPoint

Page 4

1    A   Yes.

2    Q   Okay.  And as you approached him you said get

3    on the ground.  Did he respond to you at any point?

4    A   He said he was not going to get on the

5    ground.

6    Q   He told you he was not going to get on the

7    ground.  Is that your best recollection?

8    A   According to my report, he was not going to

9    get on the ground, and then he said he couldn't get on

10   the ground.

11   Q   And did he tell you why he couldn't get on

12   the ground?

13   A   He said he was disabled.

14   Q   And did you ask him any other questions at

15   that time?

16   A   Your question is did I ask him any more

17   questions?

18   Q   Yes.  After he said he was disabled did you

19   ask him anything else?

20   A   I don't think so.

21   Q   Okay.  Did he ever refuse to get on the

22   ground?

23   A   He wouldn't get on the ground when I told him

24   to get on the ground.

25   Q   Okay.  And I guess my question is, you said

Page 61

1    Q   Okay.  Were you -- at that point when you

2    told him to get down you still had your lethal weapon

3    pointed at him?

4    A   It was -- I know I had it in my hand.  I

5    think I was pointing it at him.

6    Q   Now, at that point did you know that other

7    officers were responding to this incident?

8    A   Yes.

9    Q   And you knew that Manley and at least one

10   other officer were in the area close to you; is that

11   right?

12   A   I knew that one was up the street further

13   from me.

14   Q   And you knew that Cameron was there with you,

15   didn't you?

16   A   Yes.

17   Q   So within very -- well, how did you know one

18   was up the street?

19   A   Prior to -- or after I arrived I believe it

20   was Mark Manley, and we were going to shut the street

21   down to keep vehicular traffic from coming down the

22   street.  So we were going to block off the street.

23   Q   Okay.  So you told this man -- you gave him

24   directions to get on the ground, and were those your

25   words, "get on the ground" or "get down," or what do

Page 63

1    here he refused, and I want to -- did he refuse, or did

2    he just not get on the ground, if there's a difference

3    to you?

4    A   He refused to comply with my commands.

5    Q   Okay.  And after he refused, he says he was

6    disabled, did he describe anything about an inability

7    to get on the ground?

8    A   No.

9    Q   Did he describe anything about, "If I get on

10   the ground, I can't get up"?

11   A   Yes.

12   Q   Tell the jury about that.

13   A   I'm reading what I wrote here.  I think it's

14   in there.  I don't see it in here.  No.  I don't, I

15   don't see where I wrote that in here.  So I don't --

16   Q   Okay.  And what was his speech and demeanor

17   at that time?

18   A   His speech seemed -- let me see if I wrote

19   that in here.  It was, like, slurred.  I considered his

20   speech was -- yeah, it seemed slurred.

21   Q   And what did that reflect to you as a police

22   officer?

23   A   He could be intoxicated.

24   Q   And that came to your mind, didn't it?

25   A   I don't remember if that came to my mind.

Page 62

1    you remember saying?

2    A   Just from personal recollection, it was, "Get

3    on the ground."

4    Q   Okay.  And he did not follow those

5    directions, and you remember him responding to you

6    saying, "I'm disabled"?

7    A   Yes.  He did not get on the ground, and I

8    remember him saying he was disabled.

9    Q   Did he threaten you in any manner or means?

10   A   Verbally?

11   Q   Any manner.

12   A   I'm -- the threat in the totality of the

13   circumstance in that call where we're dealing with a

14   subject who says he's going to shoot his son, shots

15   being fired, we could not eliminate the possibility

16   that a weapon was going to be produced at that time.

17   Q   Okay.  But he didn't say he was going to

18   shoot police officers, did he?

19   A   No.

20   Q   He didn't say he was going to shoot you, did

21   he?

22   A   No.

23   Q   He did not threaten you, did he?

24   A   The threat was there.

25   Q   Okay.  Did he have a weapon visible to you?

Page 64

16  (Pages  61  to  64)

1      A   No.

2      Q   This man was a very heavy-set man with a big

3   belly, wasn't he?

4      A   He was a -- I'm saying about 200 pounds.

5      Q   Okay.  Big belly, if you knew?

6      A   I don't, I don't remember that.

7      Q   Did you see any signs of a weapon on him?

8      A   I could not see a weapon.

9      Q   Okay.  And you don't remember whether he was

10  barefoot or not, but you knew you were at his

11  residence, didn't you?

12     A   I knew I was where he was.

13     Q   Okay.  Did you see any signs that his son was

14  there?

15     A   Could not see into the house.

16     Q   I understand, but you said if his son was

17  there something about the threat involving his son; am

18  I correct?

19     A   Correct.

20     Q   Okay.  Did you see any signs that his son was

21  there?

22     A   Be specific.  I mean --

23     Q   Did you when you drove up, did you see a

24  vehicle or anything suggesting his son was at the

25  house?

Page 65

---

1      A   I don't know what the son drives, and I don't

2   recall what vehicles were there.  I don't recall

3   see -- there was not a vehicle in the driveway, but I

4   don't remember what vehicles were on the street, if

5   any.

6      Q   What was the next thought that occurred or

7   next action that occurred out there?

8      A   From what point?

9      Q   From when you said get down and you say he

10  refused.

11     A   When Officer Cameron was coming up from my

12  side.

13     Q   Now, you were the first officer on scene; is

14  that right?

15     A   Yes.

16     Q   And you were the primary officer dealing with

17  him; is that correct?

18     A   I was the first officer speaking with him.

19     Q   And you were the one having the primary

20  conversations with him, weren't you?

21     A   Yes.

22     Q   Okay.  And you saw Officer Cameron coming up

23  from the side.  Describe to the jury what occurred

24  after that.

25     A   Mr. Sizer refused to obey my commands to get

Page 66

---

1   on the ground.  He also refused the commands of Officer

2   Cameron.

3      Q   And what were her commands?

4      A   That he was going to be tased if he didn't do

5   what we were asking him to do.

6      Q   And you heard her say that?

7      A   I heard her saying, "You need to get down on

8   the ground or you're going to get tased," something to

9   that effect.

10     Q   And did you hear Mr. Sizer respond to Officer

11  Cameron?

12     A   I know he -- what did he say?  He said

13  something like, "Ohhh," or something like that.

14     Q   Okay.  Do you remember him telling her he

15  could not get on the ground?

16     A   I remember that.  I don't know if it was to

17  her or me.

18     Q   Okay.  And what occurred next after your best

19  recollection of these conversations?

20     A   He refused to comply with our commands to get

21  on the ground.

22     Q   Okay.

23     A   And then he was tased.

24     Q   Did you say anything to Cameron before she

25  tased him?

Page 67

---

1      A   Yes.

2      Q   And what did you say to her?

3      A   From where I was I started to say to Officer

4   Cameron, "Go ahead and go with lethal coverage, I'll go

5   hands on."

6      Q   You say you started to say that.  Do you know

7   if you said that?

8      A   No.  Yeah.  I -- yeah.  I said that.  What I

9   mean is I don't know, you know, what she heard, what

10  she didn't hear.

11     Q   Okay.  What did you say to Officer Cameron?

12     A   "Go to lethal coverage, and I'll go hands

13  on."

14     Q   And that was a direct -- a direction from you

15  to what you wanted her to do; is that correct?

16     A   That was a option that was available to me

17  from my perspective.

18     Q   So did you direct her to do it, or did you

19  give her an option?

20     A   The incident was very fluid, and we had two

21  different vantage points or angles on Mr. Sizer.  I

22  could see from my angle, and she could see from her

23  angle.  This is a very fluid, developing incident.

24  What I was thinking I could do --

25     Q   Let me stop you.  Tell the jury what you were

Page 68

17  (Pages 65 to 68)

1   thinking you could do.

2            MS. EDWARDS:  Objection.  Let the

3   witness answer the question.

4      Q     (By Mr. Taylor)  What were you thinking you

5   could do?

6      A     I was going to go with the option of hands

7   on.

8      Q     Explain to the jury what that means.

9      A     If I have lethal coverage, I felt that I

10  could go hands on and take him down to get him

11  controlled.

12     Q     And "hands on" means you put your hands on

13  his body; is that correct?

14     A     Yes.

15     Q     And when you were thinking that were you

16  close enough to reach out and put hands on?

17     A     I would have been -- I'm trying to remember

18  the exact or the approximate distance from him, but I

19  was close enough to where if I did that, I could get to

20  him.

21     Q     Okay.  And to put hands on, his hands were

22  both visible and up; is that correct?

23     A     No.  His hands were both visible, but when

24  you say "up," are you referring to this [indicating]?

25     Q     No, sir.

Page 69

1      A     Okay.

2      Q     They were visible to you; is that right?

3      A     Yes.

4      Q     In fact, the truth as you remember is, he was

5   talking to APD 911, wasn't he?

6      A     He was on the phone.  I knew that.

7      Q     Well, you didn't hear him tell you he was

8   talking to 911?

9      A     I don't know if I knew that at that time or

10  learned that later that he was on the phone with 911.

11  I'm not sure on that.

12     Q     Okay.  But the record will reflect whether he

13  said "I'm talking to 911," right?

14     A     Yeah.

15     Q     And if he's talking to 911 and he told you

16  that, that would have been something that would have at

17  least been in your mind at the time you were deciding

18  what to do; is that right?

19     A     It had no bearing as to who he was talking to

20  on the phone as to our situation in the driveway.

21     Q     Okay.  Describe to the jury what would have

22  entailed you going hands on with Mr. Sizer when you

23  thought about doing that.

24     A     Hands on would have been controlling both of

25  his hands and taking him down to the ground.

Page 70

1      Q     And was he doing anything at that point to

2   prevent you from gaining control of both of his hands

3   and taking him down to the ground?

4      A     He wasn't, he wasn't -- no.

5      Q     Okay.  And he at that point was not doing

6   anything physically to resist you from going hands on,

7   was he?

8      A     Other than not complying to my commands to

9   get on the ground voluntarily, no.

10     Q     Okay.  And he was not taking any aggressive

11  action toward Officer Cameron that you observed at that

12  time, was he?

13     A     It takes no time at all to produce a weapon

14  from behind my waistband or out of my pocket, and he

15  was not complying to our commands.  And this was a gun

16  call, a shots-fired call, and a threat-to-kill-his-son

17  call.  So when you ask was he doing anything physical,

18  okay?  He's not, he's not doing anything other than

19  standing there not complying, but it takes nothing more

20  than this [indicating] and we've got a different

21  situation.

22     Q     Okay.  Was he violent as far as you seeing

23  him?  You standing there, was he violent toward you?

24     A     He was not displaying violence at that time.

25     Q     Okay.  Was he trying to escape at that time?

Page 71

1      A     No.

2      Q     And was he threatening you or Officer Cameron

3   at that time?

4      A     The threat was there because of the nature of

5   the call.

6      Q     And how many -- how much time had passed from

7   the nature of the call when they first came through?

8      A     From the time the calls came through --

9      Q     Yes, sir.

10     A     -- till we got there?

11     Q     Yes, sir.

12     A     I don't know.

13     Q     Okay.  So in your presence was he threatening

14  anybody other than his physical presence?

15     A     He was a threat because of the nature of the,

16  the call, and the exigent circumstances at the time

17  were, do we have a victim inside that house that either

18  is dead or dying and needs our help?

19     Q     Okay.  So that was your, that was your

20  primary concern, whether there was a victim inside the

21  house who was dying or needed your help, was that

22  concern; is that --

23     A     Yes.  That is -- that was my concern.

24     Q     And that was your primary concern at this

25  point; is that right?

Page 72

18  (Pages 69 to 72)

**Page 73**

```
 1      A   It was one of the concerns.
 2      Q   Well, you weren't worried about yourself,
 3   because you're getting ready to go hands on; am I
 4   right?
 5      A   Of course I was worried about myself.
 6      Q   Well, you didn't see a gun, did you?
 7      A   I did not see a gun in his hands.
 8          MS. EDWARDS:  Objection, asked and
 9   answered.
10      Q   (By Mr. Taylor)  You were getting ready to
11   grab both of his hands, were you not?
12      A   I was going to go hands on.
13      Q   And you were going to grab his hands with
14   your hands; is that correct?
15      A   That was my intent, to secure his hands.
16      Q   And you didn't see anything by Mr. Sizer to
17   change that intent, did you?
18      A   Clarify that for me.
19      Q   He didn't do anything to prevent you from
20   going hands on.
21      A   He did not comply.  I was going to go hands
22   on, and then he was tased before I was able to go hands
23   on.
24      Q   Okay.  Now, when you said to Martha, "You go
25   lethal, I'll go hands on," did she respond to you?
```

**Page 74**

```
 1      A   No.
 2      Q   Do you know if she heard you?
 3      A   I don't know if she heard me.
 4      Q   Okay.  And what did she then say, or what
 5   occurred next?
 6      A   From what I recall, is, "TASER, TASER,
 7   TASER," and then the TASER deployed.
 8      Q   And when she tased him what occurred?
 9      A   He fell down.
10      Q   And when you heard her say "TASER, TASER,"
11   what actions did you take?
12      A   When he fell down --
13      Q   Prior to him falling when you heard "TASER,
14   TASER," did you move from where you were?
15      A   I'm not sure if I stood where I was or moved
16   back.  I don't, I don't remember.  I don't remember the
17   video.
18      Q   Do you remember whether you actually even
19   stepped out of the line and stepped to the left, to
20   your left?
21      A   I'd have to see the video to remember which
22   way I went.
23      Q   Okay.
24      A   If I went any way.
25      Q   Did you at any point think about telling
```

**Page 75**

```
 1   Martha, No, don't use the TASER?
 2      A   No.
 3      Q   Why?
 4      A   From the -- where I was and where she was
 5   had two different angles of what we can see and what we
 6   can't see, and we rely on each other to make good
 7   decisions on the best way to handle things in a very
 8   fluid call, as this was.  What she sees gave her -- she
 9   determined tasing would be the best way to take this
10   man down safely, and that's what she chose.
11      Q   Okay.  I'm going to direct you to Exhibit
12   No. 9, and this was the meeting between you and
13   Masters, and I'm going to go to page 1495.  1495, and
14   that's COA 001495, and I'm going to ask you, do you
15   remember discussing with the detectives the description
16   and the physical nature of Mr. Sizer as you saw him
17   there?
18      A   Okay.  Can I read this page, or --
19      Q   Yes, sir.  Read that page.
20      A   -- is there any particular paragraph you --
21      Q   Yes, sir.  Start at about -- go line about
22   226.
23      A   How far would you like me to read down?
24      Q   Well, on line 226 you were asked, "Does he
25   appear to be at all physically threatening or in the
```

**Page 76**

```
 1   way he was standing, his demeanor, his posture?  Was he
 2   threatening?"  And what was your response?
 3      A   Okay.  You're saying on 226 that question is
 4   asked?  Because that's not what I'm seeing.
 5      Q   And in your response on --
 6      A   My response is on 226.  So Masters asked me,
 7   "How would you say the suspect - or the suspect that
 8   you encountered in the driveway was?"  And I said, "He
 9   appeared to be on the phone.  He was on the phone and
10   he was just, you know, like he's kinda odd."
11      Q   Well, let's go back now.  You skipped a
12   sentence.  The question to you, and I'm going to read
13   it, starting at --
14      A   Where are you?
15      Q   -- 236.  "Masters: Sixties?"
16      A   Wait, wait, wait.  236?
17      Q   Yes, sir.  Let me --
18      A   Oh, I'm sorry.  I was at 226.  My apology.
19      Q   Okay.
20      A   Okay.  Let me, let me go there.
21      Q   Start reading -- well, at 234 you said, "His
22   age was in his 60s"; is that right?
23      A   Yes.
24      Q   And on 236 Masters says, "Did he appear to be
25   at all physical - physically threatening or in the way
```

19  (Pages 73 to 76)

**Page 77**

1  he was standing, his demeanor, his posture?  Was he
2  threatening?  And what was your response?
3      A   "No, he wasn't, you know, defensive posture
4  at all.  He was on the phone and in the one hand I
5  think - I think he's, like, talking like this here, um,
6  you know, I know there's a gun involved and I don't
7  know where it is."
8      Q   Okay.  So you did say he was not physically
9  threatening and he was, you say, no defensive posture
10  at all.  That's what you said, right?  So he was not
11  physically threatening as you approached him; is that
12  right?
13      A   He was -- right.
14      Q   Okay.  And I want you to go to page 1496, and
15  am I correct what you say is that on page COA 1496,
16  line 267, you respond, "I had a visual control, visual
17  of his hands.  Hands will kill you.  I could see both
18  of them and I was in a position where I felt that if I
19  had lethal coverage over him, I can go hands on and I
20  can take this guy down to the ground.  Uh, and I don't
21  know if he's got a gun back there."  Is that correct?
22      A   Yes.
23      Q   Okay.  And then on line 283 you state, "I
24  felt comfortable that if he did produce a gun, I was
25  already ready for that.  I could see both his hands,

**Page 78**

1  but they were never raised in a 'I'll give up'
2  position."  Is that what you stated?
3      A   Yes.
4      Q   Okay.  And I'm going to direct you over to
5  page COA 1499.  You were asked at line 400, Masters
6  says, "Now, why did you direct her to that option once
7  you see her walking up with the TASER, you have lethal,
8  why did you direct her to switch to lethal and you go
9  hands on?"  And what was your response?
10      A   "I felt I was close enough to be able to get
11  him into cuffs."
12      Q   Okay.  And that was your opinion; is that
13  correct?
14      A   Yes.
15      Q   And it hasn't changed, has it?
16      A   No.
17      Q   Okay.  You had some 25 years experience and
18  Martha had approximately 9; is that correct?
19      A   Yes.
20      Q   Okay.  And your opinion was based upon your
21  conversations, because you'd been talking to this man
22  before she even got there, hadn't you?
23      A   It was a very quick time before she got there
24  I think.
25      Q   Well, I understand, but you'd been talking;

**Page 79**

1  am I right?
2      A   I was giving him commands to get on the
3  ground, and he was not complying.
4      Q   Okay.  When was the last time you saw the
5  video?
6      A   Whenever, when I was interviewed by -- I'm
7  not sure if it was SIU or Masters in IA.
8      Q   Oh, so you haven't seen it since then?
9      A   No.
10      Q   Okay.  I'm going to show you what's in the
11  record as Exhibit No. 1, and I assure you, other than
12  my miscues with trying to pull this up and all, you can
13  look at it, we can stop it, and I'm going to just let
14  you play it and then I'm going to go back and we'll
15  talk about a couple of things.
16           (Video segment played.)
17      Q   Okay.  You heard this man explain to you that
18  he can't get on the ground, "I'm physically disabled,"
19  didn't you?
20      A   Yes.
21      Q   You heard him say, "I'm physically disabled.
22  If I get on the ground, I cannot get up," didn't you?
23      A   Yes.
24      Q   You heard Martha say, "Get on the ground,"
25  and he says, "I can't.  If I get on the ground, I will

**Page 80**

1  not get up."  You heard him say that two or three
2  times, didn't you?
3      A   Yes.
4      Q   Okay.  Was there any question this man was
5  telling you he could not physically get down on the
6  ground?
7           MS. EDWARDS:  Objection.
8      Q   (By Mr. Taylor)  In your mind, was there any
9  question at this time?
10      A   We have heard every excuse in the book --
11      Q   I understand.
12      A   -- on the street.  Okay.  Just because a man
13  says "I can't" do something --
14           (Video briefly played.)
15      Q   I'm sorry.
16      A   Pause it while I answer the question.
17      Q   Yes, sir.  That's what I caught myself trying
18  to do.  I apologize.
19      A   We've heard every excuse in the book why
20  somebody can't do something --
21      Q   Yes, sir.
22      A   -- when we're giving them commands to do
23  something, and it takes but one split second for
24  somebody, anybody, man, woman, or child, to produce a
25  weapon, a handgun, and this call involved a handgun or

20  (Pages 77 to 80)

1  because you're saying -- what I'm -- what I think
2  you're saying is, is he holding his fists up?  Is he
3  pointing a weapon?  Is he being this way or that way
4  towards me?  No.  He's not doing that, but I can't see
5  behind him, I can't see if there's a weapon, I can't
6  see in his pockets.  Anything -- a weapon can be
7  produced so very fast.  Mr. Taylor, that's what I'm
8  dealing with.
9      Q    And, sir, I understand that, but as I
10  **remember your testimony was to the investigators, SIU,**
11  **was that you felt at that point you could contain him**
12  **by hands on; is that right?**
13      A    I felt that I could take him down to the
14  ground and go hands on.
15      Q    And there was nothing that was done by
16  Mr. Sizer to change that opinion, was there?
17      A    What was -- not different, but I had another
18  officer that had another view of him, and what she sees
19  that I can't see, I don't know.
20      Q    Okay.  Now, you --
21      A    So she took her action, which was an
22  appropriate action.
23      Q    Okay.  And let me, let me back up.
24          (Video segment played.)
25          MR. TAYLOR:  Sandy, I'm going to

Page 85

1  ask that you record on the record what is being said
2  here, and then I'll question him about it.  So I'm
3  going to go back to the video, sir, and I'm going to
4  play it with the understanding the court reporter is
5  going to be taking it down.
6          MS. EDWARDS:  I'm going to object.
7  Sandy, can you clearly hear everything that's being
8  said on the video to be able to record it?
9          THE REPORTER:  I guess it depends
10  on which portion it is, so I'll see.  I don't usually
11  record videos.
12          MR. TAYLOR:  I understand that.
13          MS. EDWARDS:  I think you need to
14  get a certified court reporter to transcribe it who has
15  headphones and whatever equipment they use and can
16  replay it.
17          MR. TAYLOR:  And Sandy, I'm going
18  to ask you to record what you can hear.
19          MS. EDWARDS:  And I'm going to
20  object.
21          MR. TAYLOR:  That's fine.
22          THE WITNESS:  And I'm going to get
23  a glass of water, if that's okay with everybody.
24          MS. EDWARDS:  Sure.
25          (Video segment played.)

Page 86

1          CORPORAL REALE:  I'm not asking you, I'm
2  telling you.  Get your hands where I can see
3  them and get on the ground.  Get on the ground.
4  Get on the ground.
5          MR. SIZER:  I can't.
6          CORPORAL REALE:  Why can't you?
7          MR. SIZER:  I'm physically disabled.
8          CORPORAL REALE:  Okay.  I'm going to --
9          MR. SIZER:  I'm still talking to 911.
10          CORPORAL REALE:  Okay.  Okay.
11          (Crosstalk)
12          OFFICER CAMERON:  Sir, I'm going to tase you if
13  you don't get on the ground. sir.
14          MR. SIZER:  Ohhh.
15          MS. EDWARDS:  I'm going to object.
16          OFFICER CAMERON:  Okay?  Please get on the
17  ground.
18          MS. EDWARDS:  The court reporter is
19  shaking her head --
20          MR. SIZER:  I can't.
21          MS. EDWARDS:  -- that she can't get
22  all the cross talk.
23          (Crosstalk)
24          MR. SIZER:  -- on the ground, I will not get
25  up.

Page 87

1          OFFICER CAMERON:  TASER, TASER.
2          CORPORAL REALE:  Okay.
3          OFFICER CAMERON:  -- TASER.
4          MR. SIZER:  No, no, no.
5          MR. TAYLOR:  I note your objection.
6  Were you able to get any of that down?
7          THE REPORTER:  I got some of it.
8          MS. EDWARDS:  Did you get all of
9  it?
10          THE REPORTER:  No.
11          MR. TAYLOR:  That's fine.  I'm
12  going to do it one more time with the understanding
13  that I understand that there's an objection.
14          MS. EDWARDS:  So I don't
15  understand, what are you doing one more time for, what
16  purpose?
17          MR. TAYLOR:  Because I want to do
18  it one more time for my purpose.
19          MS. EDWARDS:  My question is, are
20  you asking her to record it again?
21          MR. TAYLOR:  Yes.  Yes.  Yes.  I'm
22  asking her to record what she can get.
23          MS. EDWARDS:  Objection.
24          MR. TAYLOR:  And this is starting
25  at 15:18.37 in Exhibit No. 1.

Page 88

22 (Pages 85 to 88)

**Page 89**

1 　(Video segment played.)
2 　**CORPORAL REALE:** -- your hands where I can see
3 　them and get on the ground.  Get on the ground.
4 　Get on the ground.
5 　**MR. SIZER:** I can't.
6 　**CORPORAL REALE:** Why can't you?
7 　**MR. SIZER:** I'm physically disabled.
8 　**CORPORAL REALE:** Okay.  I'm going to --
9 　**MR. SIZER:** I'm still talking to 911.
10 　**CORPORAL REALE:** Okay.  Okay.
11 　(Crosstalk)
12 　**OFFICER CAMERON:** Sir, I'm going to tase you if
13 　you don't get on the ground, sir.
14 　**MR. SIZER:** Ohhh.
15 　**OFFICER CAMERON:** Okay?  Please get on the
16 　ground.
17 　**MR. SIZER:** I can't.
18 　**OFFICER CAMERON:** Why?
19 　**CORPORAL REALE:** Martha, go, go lethal, I'll
20 　go, I'll go hands on.
21 　**MR. SIZER:** If I go on the ground, I will not
22 　get up.
23 　**OFFICER CAMERON:** TASER, TASER, TASER.
24 　**CORPORAL REALE:** Okay.
25 　**OFFICER CAMERON:** -- TASER.

**Page 90**

1 　**MR. SIZER:** No, no, no.
2 　　**MR. TAYLOR:** Stopping at 15:19.16.
3 　15:19.16.
4 　Q　Sir, I'm going to ask you one other thing
5 　about this.  Tell me if you appear to move to your left
6 　and out of range, and as Martha says "TASER, TASER,
7 　TASER" you say "Okay" and then move to your left and
8 　back away from this incident.
9 　　(Video segment played.)
10 　Q　My question to you, sir, is whether you
11 　observe yourself say "Okay" and then start moving four,
12 　five steps to the left toward Martha and away from
13 　wherever the direction of the TASER would have been.
14 　A　Yes.  I started moving.
15 　Q　Okay.  And what were you doing at that point?
16 　A　You know, I think I was getting out of the
17 　way of the TASER deployment.
18 　Q　Okay.  And when Martha said "TASER, TASER,
19 　TASER," do you remember yourself saying "Okay"?
20 　A　I'm acknowledging I hear her she's going to
21 　deploy the TASER.
22 　Q　That your saying okay, was that an indication
23 　that you were agreeing to that?
24 　A　I was -- yes.
25 　Q　Okay.  Did you have -- was there any point in

**Page 91**

1 　time where you asked Mr. Sizer whether there was a gun
2 　and where the gun was prior to him being tased?
3 　A　We'd have to play that again, but I don't
4 　think I did ask him --
5 　Q　Okay.
6 　A　-- where the gun is.
7 　Q　And I assure you it was not in there, but I'm
8 　just saying do you have an independent recollection of
9 　it, and you don't, do you?
10 　A　No.
11 　Q　Okay.  Was there anything done by Officer
12 　Cameron in this situation that you felt was not within
13 　the training of Austin Police Department?
14 　A　If I understand the question, you're asking
15 　did she do anything wrong or that was outside of
16 　departmental policy?
17 　Q　Yes, sir.
18 　A　No.  I think she did everything right.
19 　Q　And do you believe the amount of force she
20 　used was reasonable?
21 　A　Yes.
22 　Q　And is it your opinion she followed the
23 　protocol, training, and procedures of the Austin Police
24 　Department?
25 　A　Yes.

**Page 92**

1 　Q　Okay.  Now, you were the first officer on
2 　scene; is that correct?
3 　A　Yes.
4 　Q　And you were the senior officer in this
5 　situation; is that correct?
6 　A　Yes.
7 　Q　And why is it that you were not the officer
8 　assigned to do the write-up and the paperwork in this
9 　situation?
10 　A　As we discussed earlier, the patrolmen are
11 　the ones that are doing the bulk of the work.  Now, as
12 　the corporal, my job is to write my supplement, and as
13 　the officers would take the what we call the front
14 　sheet and the main portion of the report.
15 　Q　And is that routine for the Austin Police
16 　Department?
17 　A　Yes.
18 　Q　So the case was literally assigned to her; is
19 　that correct?
20 　A　I'm going to say yes, but, you know, I'm
21 　pretty sure she was the one did the front page.
22 　Q　Do you know whether she heard any of the
23 　information that was being spoken from Mr. Sizer to you
24 　prior to her tasing Mr. Sizer?
25 　A　Your question is did she hear what he was

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749  (512) 301-7088

1  saying to me?
2      Q   Yes, sir.
3      A   I can't answer for her.
4      Q   Okay.  But you were having conversations with
5  him, whatever the extent, prior to her arriving; is
6  that correct?
7      A   I was talking with him --
8      Q   Okay.
9      A   -- before her arriving.
10     Q   Has there been any disciplinary actions
11 toward anybody based on this incident of March 6th,
12 2015?
13     A   No.
14     Q   Has there been any retraining or reprimands
15 of anybody based on this tasing of Mr. Sizer on March
16 6, 2015?
17     A   I am not aware of any.
18     Q   Okay.  And is it your professional -- is it
19 your opinion as her supervising officer that everything
20 she did was in accordance with APD and your training
21 and procedures with her?
22     A   Yes.
23     Q   Okay.  I'm going to show you Exhibit No. 11.
24         (Exhibit No. 11 marked.)
25     Q   Can you tell the jury what that is?  And it's

Page  93

---

1  COA 2525, 2526.  What do you understand that to be?
2      A   Want me to read it?
3      Q   Take a minute and read it.  Yes, sir.  I
4  apologize.
5      A   Okay.
6      Q   Okay.  And what is this, in your
7  understanding, sir?
8      A   This is part of our response to resistance
9  policy.
10     Q   Okay.  And in this particular situation when
11 you all responded in this case was there any concerns
12 given to the possible injury to Mr. Sizer based upon
13 him being tased?
14     A   Say that again, please?
15     Q   Yes, sir.  Were you or Ms. Cameron concerned
16 about any possible injury to Mr. Sizer in addition to
17 the tasing?
18     A   Were we concerned about injuring him?
19     Q   Yes.  Him falling, him being injured by being
20 tased.  You know when you tase someone they're going to
21 fall down, right?
22     A   We know when we tase somebody they're going
23 to have neuromuscular incapacitation.
24     Q   And tell the jury what that means.
25     A   Their muscles are going to lock up.

Page  94

---

1      Q   And what's the expected result of that?
2      A   They could fall.
3      Q   Okay.  And when they fall in a situation
4  where they fall forward or backwards, what do you
5  expect to be the parts of their body to impact on the
6  ground or the concrete or wherever they land?
7      A   The TASER was designed to minimize injury to
8  both officers and subjects that we encounter that the
9  TASER will be deployed on.  That's what it's designed
10 to do --
11     Q   Yes, sir.
12     A   -- is to limit the injury factor.
13     Q   Okay.
14     A   So your question is what did I think was
15 going to happen?
16     Q   Yes, sir.
17     A   Okay.  He would have a muscular lockup and he
18 would fall down to the ground and we would cuff him.
19     Q   Okay.  And you knew he was on pavement at the
20 time this occurred, right?
21     A   We were on the driveway.  Yes.
22     Q   Okay.  I'm going to show you Exhibit No. 12.
23         (Exhibit No. 12 marked.)
24     Q   I ask you if you can identify that, sir, have
25 you ever seen anything like that?

Page  95

---

1      A   I'm not sure if I've read that before, sir.
2      Q   Okay.  It's COA 2809, and as you see at the
3  bottom under the little square, it says "TCLEOSE,"
4  T-C-L-E-O-S-E.  Tell the jury what TCLEOSE is.
5      A   Texas Combined Law Enforcement Association
6  something something.
7      Q   Okay.  So you're not personally familiar with
8  COA 2809; is that correct?
9      A   I don't know that I have or have not read
10 that before.
11     Q   Okay.
12         (Exhibit No. 13 marked.)
13     Q   I'm going to show you exhibit COA 2494 and
14 ask you if you've ever seen that before, sir.  Have you
15 ever seen that?
16     A   I think I've read that before.
17     Q   And what does that say to you, sir?  What
18 does that tell you?  What's your understanding of it?
19     A   My understanding of it is if I see or
20 somebody, another officer, sees an officer that's doing
21 something that they shouldn't do, in excess -- in this
22 case, excessive force -- not in this case, but in what
23 they're saying here, excessive force, has the due
24 diligence to prevent that.
25     Q   Okay.  And you know that's the status of

Page  96

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749  (512) 301-7088

1 APD's policies, certainly as of March 6, 2015 when this
2 occurred; is that correct?
3     A   Yes.
4     Q   Okay.  I'm going to show you Exhibit No. 14
5 and ask you if you can look at that and tell me what
6 you understand that to be, sir.
7             (Exhibit No. 14 marked.)
8     A   Yes.  I understand.
9     Q   And tell the jury what COA 2842 is and how
10 you may be familiar with it.
11     A   This, this is, I believe, in our policy also.
12 "Is the suspect an imminent threat to the officer or
13 others?  Is the suspect actively resisting or evading
14 seizure?  What is the severity of the crime at issue?"
15 I believe these are all in our policy regarding the use
16 of the TASER.
17     Q   Okay.  Now, when Mr. Sizer is standing there
18 before you on March 5th, 2015, was he an immediate
19 threat to officers or others at that time?
20     A   Yes.
21     Q   And who was he a threat to?
22     A   Myself, Officer Cameron, and anybody else
23 that was around.
24     Q   And the threat was based upon what you've
25 already told this jury; is that correct?

Page 97

1 says "I can't, I'm disabled," I can't take that as
2 being fact.  I can't, I can't -- I don't have the time
3 or the luxury of time because of the type of call and
4 the gun being involved.
5     Q   Well, but you had at least two officers
6 either on scene or just down the street at this time,
7 didn't you?
8     A   Yes.
9     Q   And both of them were fully armed, as were
10 you; am I correct?
11     A   Yes, you are.
12     Q   And if something had happened, you'd already
13 been told shots fired before you even arrived at the
14 spot; am I correct?
15     A   Say that again?
16     Q   You'd already gotten a call saying three
17 shots fired before you even saw Mr. Sizer the first
18 time; am I correct?
19     A   That's correct.
20     Q   So the urgency was the fact that his son
21 could be in there and his son could be injured or could
22 be dead; am I correct?
23     A   That's not the only issue.  That is a issue,
24 and the other issue is this man Sizer in front of me
25 with the potential to produce that weapon that was said

Page 99

1     A   And that would be, so that I'm clear?
2     Q   The fact that he could possibly have a weapon
3 on his body or near him or somewhere.
4     A   Yes.
5     Q   But other than that, there's no other threat
6 he made to you?
7     A   The threat, no other threat was verbalized by
8 Mr. Sizer, but the threat was there.
9     Q   And please don't misunderstand me.  I'm not
10 downplaying the fact that a weapon was at play, but I'm
11 just saying that was the threat we're talking about in
12 this situation; is that right?
13     A   That a weapon could be produced at any
14 moment.
15     Q   Okay.  Was he actively resisting or evading
16 seizure?
17     A   He was not actively resisting or evading
18 seizure, but he was not complying to our commands so
19 that we could be safe and get to the next step of this
20 call, which was to see who was in the house and needed
21 our attention, medical assistance.
22     Q   And did you have any knowledge other than
23 what he told you about whether he had the ability to
24 get on the ground?
25     A   Again, we've heard it all out here.  When he

Page 98

1 to have been fired.
2     Q   Okay.  Well, the reason I'm asking is you're
3 saying time is a factor.  If his son was already shot
4 or dead, timing is not going to necessarily cause you
5 to -- I'm sorry.  Timing is not going to require you
6 to do something quick -- strike that.  Strike that.
7 Okay.
8     A   I was going to ask you a question on that.
9     Q   What is the severity of the crime at issue at
10 this point, sir?
11     A   The severity of this call and crime was
12 we -- was the potential that this man's son was dead or
13 dying from his -- from Mr. Sizer shooting him.
14     Q   Okay.
15             (Exhibit No. 15 marked.)
16     Q   I'm going to show you Exhibit 15, which is
17 COA -- which is 002430 and 2431, and ask you if you can
18 take a minute and look at it.  Take as much time as you
19 need and tell me what you understand that to be.
20     A   Okay.
21     Q   Are you familiar with that?
22     A   Yes.
23     Q   Okay.  Tell the jury what that is.
24     A   Well, we're looking at the response to
25 resistance and some guidelines that guide us into how

Page 100

25  (Pages 97 to 100)

1    we respond to these levels of resistance.

2        Q    And can you tell the jury, looking on page 2,

3    what was the level of resistance, in your opinion, of

4    Mr. Sizer?

5        A    We, we had, we had passive resistance. He's

6    not, he's not charging anybody, he's, he's not, you

7    know, in a defensive posture of raising his fists, but

8    we also could have preparatory resistance, which we've

9    seen many times before. People are gaining the courage

10   to go for the weapon. They're, they're talking,

11   they're getting themselves ready.

12       Q    Is it your --

13       A    So -- go ahead.

14       Q    Is it your testimony to this jury that you

15   felt you had preparatory resistance in this case?

16       A    It's my, it's my opinion that the -- that

17   Mr. Sizer was, was acting passively while he's talking

18   to us as far as he's, he's not, he's not complying, but

19   he's not charging me. But again, through my experience

20   as a police officer for all these years, it doesn't

21   take but a second to reach behind and, and produce that

22   weapon.

23       Q    I understand.

24       A    That may or may not be there.

25       Q    I understand.

Page 101

---

1        A    Okay? So in this situation, you know, I

2    think we have, we have both here. He could be

3    preparing mentally to go for the weapon.

4        Q    Did you --

5        A    I don't know that.

6        Q    Well --

7        A    I mean, I don't know what he's -- what's in

8    his head.

9        Q    I'm asking you, this is the training that's

10   provided to you --

11       A    Um-hm.

12       Q    -- as an officer; is that correct?

13       A    Right. And in our training we, we have to

14   take the whole situation.

15       Q    I understand.

16       A    Okay? If you pick it apart and have Monday

17   morning quarterbacking, which we don't have the luxury

18   of that or 20/20 hindsight on this, we have to assess

19   what we have in a matter of seconds and make a

20   determination that safely resolves the situation, and

21   that's what we did.

22       Q    And in this case it is your testimony that

23   what you have, based upon this exhibit, is passive

24   resistance and a possibility, in your mind, that it

25   could have been preparatory resistance; is that

Page 102

---

1    correct?

2        A    Yes.

3        Q    But it's clearly passive resistance from the

4    training you've received; is that right?

5        A    No. I would -- I'm not going to agree to

6    answer a yes --

7        Q    Okay.

8        A    -- to that.

9        Q    I'm sorry. You tell me what it is.

10       A    Okay. We have, we have a combination of

11   things here. Okay? I don't have this man lunging at

12   me or yelling at me or cussing at me, but I also have

13   the information of the nature of the call, and I can't

14   see behind this man's back and I can't get in his head

15   of what he is going to do or is not going to do.

16           So the preparatory resistance can be I'm

17   preparing. I'm getting myself ready to produce this

18   weapon while he's talking to me and talking to whoever

19   else is out there.

20       Q    Can you --

21       A    So he, he's appearing to be passive, but it

22   could very well be preparatory.

23       Q    Can you ever get inside any suspect's head

24   when you are confronting them and trying to decide what

25   to do?

Page 103

---

1        A    Again, we are only human beings.

2        Q    Yes.

3        A    And we do have training, and we do not have

4    the luxury of, of time in most cases, especially when

5    the call is as serious as this.

6        Q    So in every single case would you agree with

7    me that every case would have the possibility of

8    preparatory resistance?

9        A    Not every. I won't agree to every single

10   case.

11       Q    Okay.

12       A    But it's there.

13       Q    Okay.

14           MS. EDWARDS: Bobby, it's near

15   noon. Do you think we're getting close?

16           MR. TAYLOR: Yes, ma'am. Yes,

17   ma'am.

18       Q    What is your understanding of how often

19   officers who use TASERs are supposed to be recertified

20   or retrained, sir?

21       A    I don't know how often they're supposed to be

22   retrained and recertified other than what we normally

23   do when we, when we go to the range to qualify with our

24   duty weapon.

25       Q    So you have no idea?

Page 104

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749  (512) 301-7088