# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

ESTATE OF JAMES SIZER, SR., by and
through his heirs Dorothy Sizer, Caroline
Wolff, and James Sizer, Jr., DOROTHY
SIZER, CAROLINE WOLFF, and JAMES
SIZER JR.,
            **Plaintiffs,**

-vs-

OFFICER MARTHA CAMERON,
OFFICER SALVATORE REALE, and the
CITY OF AUSTIN,
            **Defendants.**

**CAUSE NO.:
A-15-CA-01143-SS**

# O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause,

and specifically Defendants' Motion for Leave to File Second Amended Answer [#36],

Plaintiffs' Response [#41] in opposition, and Defendants' Reply [#42] in support; Plaintiffs'

Motion for Summary Judgment [#35], Defendants' Response [#44] in opposition, and Plaintiffs'

Reply [#45] in support; Defendants' Motion for Summary Judgment [#58], Plaintiffs' Amended

Response [#66] in opposition, and Defendants' Reply [#68] in support; Defendants' Opposed

Motion to File Sealed Document [#43] and Plaintiffs' Response [#47] in opposition; Defendants'

Motion to Strike Plaintiffs' Summary Judgment Evidence [#46] and Plaintiffs' Response [#51] in

opposition; as well as Defendants' Motion to Strike Plaintiffs' Summary Judgment Response

Evidence [#67].[1] Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

## Background[2]

The heirs and surviving family members of James Sizer, Sr. (collectively, Plaintiffs) bring this action against Officer Martha Cameron, Corporal Salvatore Reale, and the City of Austin, alleging Section 1983 claims for violations of Sizer's constitutional rights[3] and state law claims for wrongful death. Plaintiffs claim James Sizer, Sr. (Sizer) died eight days after his arrest as a result of Officer Cameron's unlawful use of force in tasing him.

Beginning around 2:30 p.m. on March 6, 2015, Sizer made three calls to 311 and 911 to request police assistance at his residence at 11936 Bittern Hollow Drive, Austin, Texas 78758. During the first phone call to 911, Sizer explained he was calling in regards to his son, who he claimed was dangerous and should not be carrying a gun. He further stated, "[w]hen he comes in my house, I have many handguns, and he will when I open the garage door. I will point any gun I have on my property against him." Tr. of 311/911 Calls at 5. Sizer gave the 911 dispatcher his address, and the dispatcher told Sizer a police officer would be on his way. Sizer made his

---

[1] The Court also considered Defendants' Motion to Compel Discovery from Retained Expert [#33] and Defendants' Motion to Exclude Expert Opinions and Testimony of George L. Kirkham [#34]. Because the Court grants Defendants' motion for summary judgment, these motions are DISMISSED AS MOOT.

[2] The description of events is taken largely from the Court's thorough review of the certified transcripts provided by Defendants of the four 311 and 911 phone calls made on March 6, 2015, as well as the DVDs depicting the video and audio recording of Corporal Reale's and Officer Cameron's dash cam videos, which both parties provided. *See* Defs.' Mot. Summ. J. [#58-1] Ex. A (Tr. of 311/911 Calls); Pls.' Mot. Summ. J. [#35-1] Ex. 3 (Reale Dash Cam Video); *id.* Ex. 4 (Cameron Dash Cam Video); Defs.' Mot. Summ. J. [#58-1] Ex. B (same); *see also Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011) ("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene."). In instances where the parties attached the same exhibits to their respective motions for summary judgment, the Court cites to Plaintiffs' exhibits.

[3] As the heirs of Sizer's estate, Plaintiffs have standing to bring survival and wrongful death actions under 42 U.S.C. § 1983. *See, e.g., Brazier v. Cherry*, 293 F.2d 401, 406–07 (5th Cir. 1961) (incorporating both a state's survival statute and its wrongful death statute to provide full remedies for § 1983 violations); *see also King ex rel. Chaney v. Texas Med. Bd.*, 576 F. App'x 353, 354–55 (5th Cir. 2014).

second call to 311, and when 311 transferred him to 911, Sizer explained, "[t]here's no emergency. It's just I'm fully armed and ready for anything." *Id.* at 8. He then gave the dispatcher his address, stating, "if there's not an idiot here soon, I'm ready. I'm fully armed." *Id.* During his third call to 911, Sizer told the dispatcher he "shot three rounds of ammunition. Stupid by me. And I've been trying to call the cops for an hour now, and those a—holes don't come." *Id.* at 12. When the dispatcher told Sizer that an officer was "on scene," Sizer responded, "[n]o A—HOLE cop is on the f—cking street." *Id.* Sizer again stated he "had gun powder on [his] hands" and had fired three shots in his backyard "just so somebody would hear it," "so the 311 person would hear it and no idiot cop here yet." *Id.* at 12, 13. The dispatcher told Sizer that people in his neighborhood had heard the shots and called the police. Indeed, in between Sizer's first and second phone calls requesting police assistance, one of Sizer's neighbors called 911 and reported "[t]hree shots fired." *Id.* at 18.

Neither party has provided the Court with a complete record of the information Officer Cameron and Corporal Reale received from the dispatchers regarding the nature of Sizer's 311 and 911 calls. The transcript of the audio recording of Corporal Reale's dash cam video reveals an unknown male voice reporting "three shots about two or three minutes ago"; an unknown female voice stating "the caller is saying he's loaded and ready for anything and then shots came out"; and Officer Cameron asserting "he's (indiscernible) shot off three rounds saying he's upset we're not there." Defs.' Mot. Summ. J. [#58-1] Ex. B (Officers' Dash Cam Video Tr.) at 32–34. The audio recording from Officer Cameron's dash cam video is less informative, because it did not begin until shortly before she arrived at Sizer's residence. Nevertheless, both officers testified they knew they were responding to a report of "shots fired" where the suspect had threatened to shoot his son, and Officer Cameron testified she knew Sizer warned the dispatcher

that he was "armed and ready for anything." Defs.' Mot. Summ. J. [#58-1] Ex. E (Cameron Decl.) ¶¶ 9–10; Defs.' Mot. Summ. J. [#58-1] Ex. D (Reale Decl.) ¶ 8.

Corporal Reale was the first officer to arrive on the scene. Around 3:18 p.m., Corporal Reale exited his patrol vehicle in full uniform and began walking up the driveway of Sizer's residence with his service weapon drawn. Sizer was standing barefoot in his driveway, "wearing pants with his shirt pulled out raising a concern that his gun was in his waistband, just as [Corporal Reale] wore [his] when [he] was off-duty." Reale Decl. ¶ 12. Corporal Reale testified he noticed Sizer was holding a cell phone to his ear in his right hand and his left hand was empty, but because he only had a visual of his front and left side, he feared Sizer was still armed. *Id.* ¶¶ 13–14. Sizer informed Corporal Reale he was on the phone with the dispatcher. Reale Dash Cam Video at 15:18:54. As he approached Sizer, Corporal Reale issued eleven verbal commands to get on the ground, but Sizer explained he "can't" because he was physically disabled. Reale Dash Cam Video at 15:18:26–15:18:54. Corporal Reale responded, "OK." *Id.*

Officer Cameron arrived on the scene seconds after Corporal Reale. While Corporal Reale addressed Sizer, Officer Cameron began approaching Sizer from his right side. Cameron Dash Cam Video at 15:18:37. Like Corporal Reale, Officer Cameron exited her patrol car in full uniform with her service weapon drawn. Officer Cameron testified she observed Sizer standing barefoot, wearing pants and an untucked t-shirt. Cameron Decl. ¶ 13. According to Officer Cameron, she did not have a complete visual of Sizer, as she could only see "the back right and right side of [Sizer's] body." *Id.* ¶ 14.

Officer Cameron claims she heard Corporal Reale give some verbal commands to Sizer but did not hear all of what was said. Cameron Decl. ¶ 15. Specifically, Officer Cameron denies hearing Sizer claim he was disabled. *Id.* ¶ 17. Nevertheless, she maintains that even if she had

heard this allegation, it would not have changed her approach. *Id.* She explained in her declaration that APD trains its officers that "subjects will say anything to avoid arrest." *Id.*

As Officer Cameron approached Sizer, she informed Corporal Reale she was holstering her service weapon and switching to her taser. Cameron Dash Cam Video at 15:18:51. After Sizer failed to comply with Corporal Reale's eleven commands to get on the ground, Corporal Reale instructed Officer Cameron to "go lethal and I'll go hands on." Reale Dash Cam Video at 3:19:06. According to Corporal Reale, going "hands on" means controlling a suspect with both hands and taking him down to the ground. Pls.' Mot. Summ. J. [#35-1] Ex. 5 (Reale Dep.) at 70:24–25. Reale explained he believed he was close enough to Sizer to "get him into cuffs." *Id.* at 78:10–11. Rather than "go lethal" by switching to her service weapon, Officer Cameron "exercised [her] discretion" and chose not to holster her taser. Cameron Decl. ¶ 20. Cameron explained in her deposition, "[i]f I had maintained lethal cover while Corporal Reale went hands on, I would have had to shoot the subject if the takedown went bad, so I chose another takedown method that would not require that I use deadly force." *Id.* At the same time, however, Officer Cameron testified she perceived the risk of going "hands on with a subject who just fired a weapon without first confirming that he is unarmed as too high." *Id.* ¶ 21.

Thus, with her taser trained on Sizer, Officer Cameron gave Sizer two commands to get on the ground. Reale Dash Cam Video at 15:18:58. Acknowledging Officer Cameron, Sizer replied, "I can't," and stated, "[i]f I fall on the ground, I will not get up." *Id.* at 15:19:05. When Sizer did not comply with her order to get on the ground, Officer Cameron announced "taser, taser, taser." *Id.* at 15:19:11. Corporal Reale responded, "OK," and moved several steps to his left. *Id.* at 15:19:12. Officer Cameron then tased Sizer once in the back for approximately five seconds. Though the driveway slanted forward, Sizer fell backward and hit his head.

5

After Sizer fell, Officer Cameron called EMS while Corporal Reale handcuffed Sizer. A search of Sizer revealed he was unarmed, and no one was discovered inside his residence after a protective sweep was conducted. The officers arrested Sizer for discharging a firearm in a municipality, and he was transported to St. David's North Austin Medical Center, where he was held for overnight observation. *See* Pls.' Mot. Summ. J. [#35-1] Ex. 12 (Arrest Warrant) at 3; *id.* Ex. 13 (Officer Espinoza Report) at 4. Sizer's medical records reveal his blood alcohol content was .252 and a "CT of the brain revealed a left frontal subdural hematoma." Defs.' Mot. Summ. J. [#58-2] Ex. H (Sizer Medical Records) at 63. A second CT conducted the next day revealed "no change or progression of the small hematoma." *Id.* Sizer was discharged to the custody of APD the following day "in improved and stable condition" with instructions to "follow up with his primary care physician or other physician in the next week." *Id.* at 64. Moreover, "[i]t was [] explained to the patient, in the presence of the police officer at the bedside, that he is at risk of ongoing bleeding over the next couple of weeks. If there is any evidence for progressive headaches, confusion, or other neurologic derangements, the patient needs to come back to hospital as soon as possible." *Id.* at 63. Sizer was further instructed to "[h]old Celebrex for the next week to minimize bleeding risk . . . [and] [r]esume home blood pressure medications." *Id.* The "Discharge Instructions" advised Sizer to call his primary care physician "in 1 week to schedule [a] follow up . . . [and to] discontinue any other previous medications not included on this list." *Id.* at 65. Sizer signed these instructions. *Id.*

Upon his release from the hospital on March 7, 2015, APD transported Sizer to the Travis County Jail. On his intake questionnaire, Sizer disclosed he had two MRIs in the last two days, a "tiny scab back of head," "high blood pressure," and a "psychiatric disorder." Defs.' Mot. Summ. J. [#58-2] Ex. I (Travis County Jail R.) at 68. The hospital followed up with the Travis

County Jail, confirming Sizer had a "frontal left subdural hematoma small without midline shift, f/u ct this morning with no changes." *Id.* at 69. Sizer was released from the jail on March 9, 2015, to his wife, Dorothy Sizer. Pls.' Mot. Summ. J. [#35-5] Ex. 24 (Dorothy Sizer Dep.) at 118:12.

Four days later, on March 13, 2015, Dorothy Sizer found Sizer on their bathroom floor, deceased. The medical examiner report on May 13, 2015, concluded Sizer died "as a result of complications of blunt force head trauma" with a "contributing factor" of "acute and chronic ethanol abuse." *Id.* [#35-4] Ex. 16 (Medical Examiner Report) at 12.

Plaintiffs filed their complaint on December 10, 2015, alleging Officer Cameron, Corporal Reale, and the City of Austin violated Sizer's Fourth Amendment right to be free from excessive force. Specifically, Plaintiffs claim Officer Cameron used excessive force when she tased Sizer; Corporal Reale failed to prevent Officer Cameron's use of excessive force despite a reasonable opportunity to do so; and the City of Austin's failure to discipline, supervise, and properly train its officers, its negligent retention of Officer Cameron and Corporal Reale, as well as its failure to implement adequate policies governing the use of tasers proximately caused Sizer's death. Both parties moved for summary judgment. *See* Pls.' Mot. Summ. J. [#35]; Defs.' Mot. Summ. J. [#58]. These motions have been fully briefed and are now ripe for the Court's consideration.

**Analysis**

I.      **Preliminary Issues**

A.      **Defendants' Motion to Amend**

Defendants move for leave to amend their answer to correct a clerical error in which they inadvertently admit to several of Plaintiffs' allegations. *See* Defs.' Mot. Leave [#36]. In their first

amended answer, Defendants stated they "admit the allegations in Sentences 1 – 6, but deny the remaining allegations in Paragraph 10 of Plaintiffs' First Amended Complaint."[4] First Am. Answer [#27] at 2. Sentences 1–6 state, among other things, that Officer Cameron has not been certified to discharge a taser since 2008 and was not certified to do so when she tased Sizer; at the time of the incident, Corporal Reale had not been certified to discharge a taser in approximately five years; and Corporal Reale, as Officer Cameron's supervisor, knowingly allowed Officer Cameron to use the taser when he knew she was not certified to do so. First Am. Compl. [#25] ¶ 10. Defendants now maintain the sentence numbers were inadvertently transposed; according to Defendants, the sentence properly reads, Defendants "deny the allegations in Sentences 1 – 6, but admit the remaining allegations in Paragraph 10 of Plaintiffs' First Amended Complaint." Defs.' Mot. Leave [#36-1] (Second Am. Answer) at 3.

Because the deadline for amending pleadings expired on November 14, 2016, under Rule 16, Defendants are required to show good cause to amend their answer. See FED. R. CIV. P. 16. In determining whether good cause exists, courts consider four factors: (1) the explanation for the failure to comply with the scheduling order; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice. S&W Enterprises, L.L.C. v. SouthTrust Bank of Ala., NA, 315 F.3d 533, 536 (5th Cir. 2003).

Defendants have shown good cause exists to amend their answer. Contrary to Plaintiffs' representation, the Court is not persuaded Defendants "clearly intended to admit" these allegations, especially when Defendants submitted sworn testimony which flatly contradicts these admissions. See, e.g., Defs.' Mot. Summ. J. [#58-3] Ex. N (Interim Chief of Police Brian

---

[4] The Court notes that Plaintiffs' first amended complaint is not the live pleading. Plaintiffs filed their second amended complaint just three weeks after filing their first amended complaint.

Marley Decl.) ¶¶ 12, 14, 18; Reale Decl. ¶ 23; Cameron Decl. ¶ 8. Indeed, Plaintiffs were well aware of portions of this sworn testimony prior to Defendants' inadvertent admission; Plaintiffs' counsel deposed Officer Cameron on September 19, 2016, and Corporal Reale on October 12, 2016, both of whom testified they received annual taser training. Cameron Dep. at 47:18–48:14 (stating she is required to recertify in the use of her taser every year); Corporal Reale Dep. at 30:8–31:12 (explaining he recertifies in taser use every year). Moreover, Defendants represent they did not learn of the clerical error until February 13, 2017, after the deadline to amend had already passed. Defendants acted quickly and filed their motion to amend their answer that same day. *See, e.g.*, *Robinson v. Town of Colonie*, No. 91 Civ. 1455, 1993 WL 191166, at *3 (N.D.N.Y. June 3, 1993) (holding that good cause requirement is met when reason to amend is discovered after scheduling order's deadline).

The importance of this amendment is obvious. Defendants' admission concedes vital elements of their defense against Plaintiffs' Section 1983 claims. They argue the error "practically eliminate[s] any presentation of the merits of the case," at least in regard to Plaintiffs' municipal liability claims. Defs.' Mot. Leave [#36] at 1 (quoting *Raiser v. Utah Cty.*, 409, F.3d 1243, 1246 (10th Cir. 2005) (concluding the district court abused its discretion in refusing to allow the plaintiff to amend his response to a request for admission)).

Plaintiffs maintain, however, this amendment would be prejudicial because the discovery deadline expired on February 10, 2017, three days before Defendants filed their motion to amend, and Plaintiffs "stopped discovery" in reliance on Defendants' admissions.[5] But Plaintiffs'

---

[5] Plaintiffs do not challenge Defendants' representation that it became aware of the clerical error on February 13, 2017, and in fact argue Defendants' "awareness was do [sic] solely to reading Plaintiffs' Motion for Summary Judgment," which relies on Defendants' inadvertent admission to argue the City was deliberately indifferent in failing to certify its officers in taser training. Pls.' Resp. [#41]. But rather than bolster their case, this argument suggests Plaintiffs have engaged in procedural gamesmanship. It has not escaped the Court's attention that Plaintiffs' filed their summary judgment motion on the same day the deadline for discovery lapsed.

own filings suggest the parties engaged in extensive discovery. Indeed, Plaintiffs' motion for summary judgment appends 32 exhibits, and a review of George Kirkham's expert report reveals he considered over sixty documents related to this incident, a number of which relate to APD's training policies. Pls.' Mot. Summ. J. [#35-6] Ex. 32 (Kirkham Report) at 27–30. Moreover, given Corporal Reale and Officer Cameron's sworn testimony that they received annual taser training, counsel should have been on notice that Defendants' admission to the contrary was in error. The Court agrees with Defendants that the federal pleading rules were not designed so that a party could capitalize on "one misstep by [opposing] counsel" to avoid a "proper decision on the merits." *See* Defs.' Reply [#42] at 2 (quoting *United States v. E.B. Hougham, et al.*, 364 U.S. 310, 317 (1960)). Plaintiffs cannot credibly argue they are prejudiced by having to defend their claims on the merits.

Regardless, however, Plaintiffs have not suffered prejudice because the Court does not rely on evidence or allegations related to the officers' taser certifications in concluding Plaintiffs are not entitled to relief. Instead, the Court finds that, having viewed the facts in the light most favorable to Plaintiffs, Plaintiffs failed to establish the officers' actions violated Sizer's constitutional rights. *See infra* Section II.B.2.

Because they have shown good cause to amend their answer, Defendants' motion is GRANTED.

## B.    Defendants' Motions to Strike

Defendants have also filed two motions to strike evidence appended to Plaintiffs' motion for summary judgment and response to Defendants' summary judgment motion. Defs.' First Mot. Strike [#46]; Defs.' Second Mot. Strike [#67]. Defendants object to Dorothy Sizer's affidavit, which Defendants contend is not based on personal knowledge; George L. Kirkham's

expert report; and Plaintiffs' exhibits 1–4, 7–21, and 26–32. In reaching its decision on the parties' summary judgment motions, the Court did not rely on Dorothy Sizer's affidavit, Kirkham's expert report,[6] or many of the challenged exhibits. Defendants' objections to this evidence are therefore dismissed. To the extent Defendants challenge exhibits they produced in response to Plaintiffs' written discovery requests, Defendants' objections are overruled. *See* Local Rule CV-26(d) (providing that "a party's production of a document in response to written discovery authenticates the documents for use against that party in any pretrial proceedings or at trial").

## C.    Defendants' Opposed Motion to Seal

In their opposed motion for leave to file a sealed document, Defendants seek to seal a document relating to APD's taser training. Defendants do not provide a specific factual basis for sealing this document, but contend it was produced in discovery and labeled "Confidential" or for "Attorneys' Eyes Only." Plaintiffs maintain, and the Court has confirmed, that all but one page of this fourteen-page document has been previously filed as an unsealed exhibit without objection from Defendants.

"Courts have recognized that the public has a common law right to inspect and copy judicial records." *S.E.C. v. Van Wayenberghe*, 990 F.2d 845, 848 (5th Cir.1993). However, "[t]he

---

[6] The Court notes it has reviewed similar "expert reports" submitted by George Kirkham in at least two other cases; in those cases, the report is simply a letter written to counsel by Kirkham. *See Callaway v. Travis Cty.*, No. 1:15-CV-103-SS, 2016 WL 4371943, at *10 n.9 (W.D. Tex. July 28, 2016); *Chacon v. City of Austin, Tex.*, No. A-12-CA-226-SS, 2013 WL 2245139, at *6 n.4 (W.D. Tex. May 21, 2013). Kirkham's report in this case is similarly unsworn and is not competent summary judgment evidence. Moreover, Plaintiffs do not dispute that Kirkham has no training or experience with tasers, the only force complained of in this case. And Plaintiffs admit Kirkham's testimony is based in part on the knowledge and experience of his "chief primary assistant," Dave Gregg, even though Gregg is not offered as the expert witness for policing techniques. Thus, it appears Kirkham is, once again, "an unqualified expert witness whose conclusions are unreliable." *Pharr v. Wille*, No. 14-CV-762-DEA, 2016 WL 4082740, at *8 (W.D. Tex. July 29, 2016).

Even if the Court were to consider Kirkham's report reliable or competent summary judgment evidence, it does not create a fact issue as to whether Officer Cameron used excessive force against Sizer. A thorough review of the officers' videos and the undisputed evidence regarding the information the officers possessed compel this Court's conclusion that Plaintiffs failed to establish a constitutional violation.

movant 'may overcome the presumption of access by providing sufficiently compelling reasons that override the public policies favoring disclosure.'" *Jeanbaptiste v. Wells Fargo Bank, N.A.*, No. 3:14–CV–264–K, 2014 WL 6790737, at *4 (N.D. Tex. Dec. 1, 2014) (quoting *Bianco v. Globus Med., Inc.*, No. 2:12–CV–147–WCB, 2013 WL 3422000, at *2 (E.D. Tex. July 14, 2014)). Defendants' perfunctory, one-page motion does not provide the Court with "sufficiently compelling reasons" to overcome the presumption of public access. Defendants' motion to seal is therefore denied.

## II. Cross-Motions for Summary Judgment

### A. Legal Standards

#### 1. Summary Judgment

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

### 2.    Section 1983

Section 1983 provides a cause of action to individuals whose federal rights have been violated by those acting under color of state law. *Doe v. Dall. Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998). Section 1983 is not itself a source of substantive rights; rather, it merely provides a method for vindicating federal rights conferred elsewhere. *See Albright v. Oliver*, 510

U.S. 266, 271 (1994). In order to state a claim under Section 1983, a plaintiff must (1) allege a violation of rights guaranteed by the United States Constitution or federal law, and (2) show that the alleged deprivation was committed by a person acting under color of state law. *Doe*, 153 F.3d at 215.

**B.      Application**

**1.      Claims against Officer Cameron and Corporal Reale**

Officer Cameron and Corporal Reale contend qualified immunity shields them from liability on Plaintiffs' claims for excessive force and bystander liability. Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, courts undertake a two-step analysis, asking "(1) whether facts alleged or shown by plaintiff make out the violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Pasco v. Knoblauch*, 566 F.3d 572, 579 (5th Cir. 2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lytle v. Bexar Cty.*, 560 F.3d 404, 410 (5th Cir. 2009) (quoting *Saucier v. Katz,* 533 U.S. 194, 202 (2001) *overruled in part by Pearson v. Callahan,* 555 U.S. 223 (2009)).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 233. Qualified immunity "gives government officials breathing room to make reasonable

but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender,* 132 S. Ct. 1235, 1244 (2012) (internal quotation marks omitted). "[W]hile the Supreme Court has stated that 'courts should define the 'clearly established' right at issue on the basis of the 'specific context of the case,' it has also recently reminded [courts] that [they] 'must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions.'" *Luna v. Mullenix,* 773 F.3d 712, 724–25 (5th Cir. 2014) *rev'd on other grounds by* 136 S. Ct. 305 (2015) (quoting *Tolan v. Cotton,* 134 S. Ct. 1861, 1866 (2014)).

Though the Court views all facts in the light most favorable to Plaintiffs on Defendants' motion for summary judgment, the burden remains on Plaintiffs "to negate the [qualified immunity] defense once properly raised." *Brumfield v. Hollins,* 551 F.3d 322, 326 (5th Cir. 2008).

### i.     Excessive Force Claim Against Officer Cameron

### 1.     Constitutional Violation

The Fourth Amendment confers a right to be free from excessive force during an arrest. *Deville v. Marcantel,* 567 F.3d 156, 169 (5th Cir. 2009) (per curiam). Determining "whether this right was violated requires a balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Tolan,* 134 S. Ct. at 1865–66 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8 (1985)).

To establish a claim of excessive force under the Fourth Amendment, a plaintiff must show "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Cass v. City of*

*Abilene*, 814 F.3d 721, 731 (5th Cir. 2016). Under Fifth Circuit precedent, the latter two inquiries are "often intertwined." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012). Thus, the Court considers these inquiries together below.

There is no genuine dispute as to whether Sizer suffered an injury. Defendants contend, however, that Plaintiffs have failed to show Sizer's death resulted "directly and only" from the force Officer Cameron used against Sizer. Based on the record before it, the Court finds Plaintiffs have submitted sufficient evidence to raise a question of fact regarding whether Officer Cameron's tasing of Sizer caused his death. As Judge Haynes' points out in *Pratt v. Harris County, Texas*, no case has held that "'directly and only' literally means that no other cause contributed to the death in question." *See* 822 F.3d 174, 189 n.2 (5th Cir. 2016) (Haynes, J., dissenting). Contrary to Defendants' suggestion, Plaintiffs were not required to present evidence that a defendant's excessive use of force was the exclusive cause of the alleged injury; "rather, "so long as the injury resulted from 'clearly excessive and objectively unreasonable force, the plaintiff's claim is actionable.'" *Bailey v. Quiroga*, 517 F. App'x 268, 268 (5th Cir. 2013) (quoting *Moille v. City of Live Oak*, 918 F.2d 548, 553 (5th Cir. 1990)). The hospital records reveal Sizer suffered a "left frontal subdural hematoma" after Officer Cameron's takedown, and Sizer died eight days later. Though Sizer did not follow up with his primary care physician despite instructions to do so, Plaintiffs claim these instructions were given to APD officers, none of whom informed Sizer's family of his need for "additional medical services or attention." Pls.' Am. Resp. [#66] at 3. This suggests that, but for Officer Cameron's tasing, Sizer would not have died when he did.

Nevertheless, there is ample evidence in the record that Sizer sustained other physical injuries, including blunt force trauma to the head, as a direct result of Officer Cameron's use of

16

force. To the extent Defendants argue Sizer's injuries were *de minimis*, the Court finds this argument unconvincing. Defendants themselves submitted photographic proof that Sizer suffered a bloody abrasion on the back of his head as a result of the takedown; Officer Cameron's report describes the effects of the force she employed as "serious injury," including "laceration [to the] back of head/brain bleed,'" Pls.' Mot. Summ. J. [#35-3] Ex. 8 (Cameron Offense Report) at 11; and a CT scan conducted soon after the takedown reveal a "left frontal subdural hematoma." *See Hanks v. Rogers*, 853 F.3d 738, 745 (5th Cir. 2017) (concluding the plaintiff's allegations and medical records stated more than a *de minimis* injury where they revealed the plaintiff received treatment for contusions, acute strains, and bruised ribs and continued to experience pain).

Defendants next contend Plaintiffs' claim fails because they cannot show Officer Cameron's deployment of her taser was clearly excessive to the need and objectively unreasonable. "Excessive force claims are necessarily fact intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville*, 567 F.3d at 167 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). In making this determination, courts consider the so-called *Graham* factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Poole*, 691 F.3d at 638 (quoting *Graham*, 490 U.S. at 396).

In analyzing the reasonableness of an officer's decision, the Court must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. The Fifth Circuit has stated, "[w]e must adopt 'the perspective of a reasonable officer on the scene, rather than judge with the 20/20 vision of

hindsight.'" *Cooper v. Brown*, 844 F.3d 517, 522 (2016) (brackets omitted) (quoting *Graham*, 490 U.S. at 396). Thus, the appropriate inquiry is "whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Id.* (brackets and internal quotations omitted) (quoting *Graham*, 490 U.S. at 397).

In this instance, the first *Graham* factor—the "severity of the crime at issue"—counsels in favor of the force Officer Cameron used against Sizer. Both officers claim they feared Sizer may have shot his son, and the record lends support to the officers' concern. Officer Cameron testified she knew at least three things as she approached Sizer's residence: Sizer had called 311 and 911 threatening to harm his son, who she believed—based on her review of the dispatcher's notes on her in-car computer—was at Sizer's residence; Sizer told the dispatcher he was "armed and ready for anything"; and a neighbor called 911 to report "shots fired." Cameron Decl. ¶ 24. Corporal Reale explained in his declaration that reports of "shots fired" are the most serious calls officers respond to and are always handled as "priority calls because a gun is in play." Reale Decl. ¶ 9. Like Officer Cameron, Corporal Reale testified he knew he was responding to a report of "shots fired" at Sizer's residence and Sizer had made "homicidal threats" against his son to the dispatcher. *Id.* ¶ 17.

Plaintiffs argue the crime at issue was not a possible homicide, but rather the misdemeanor Sizer was ultimately charged with—shooting a firearm within city limits. They claim Sizer never made "homicidal threats" against his son because during his calls to 311 and 911, Sizer stated, "I'm not threatening to shoot [my son]" and "I've been doing some shooting in the back yard just so that somebody would hear it." Tr. of 311/911 Calls at 6, 12. Moreover,

Plaintiffs contend the officers should have known no "exigent circumstances" existed because Sizer admitted to the dispatcher that the shots were fired into the ground, not at another person.

As an initial matter, the transcript of Sizer's 311 and 911 plainly discredits Plaintiffs' argument that Sizer never threatened his son; Sizer twice stated he would "point any gun [he] ha[s]" at his son because his son is "psycho," and further admitting to being "fully armed and ready for anything." Moreover, Plaintiffs' argument erroneously focuses on the information Sizer conveyed to the dispatcher, rather than the information the dispatcher conveyed to the officers. The transcript from the audio recording of Corporal Reale's dash cam video reveals an unknown male voice reporting "three shots about two or three minutes ago"; an unknown female voice stating "the caller is saying he's loaded and ready for anything and then shots came out"; and Officer Cameron asserting "he's (indiscernible) shot off three rounds saying he's upset we're not there." As noted, both Officer Cameron and Corporal Reale testified they believed they were responding to a call involving threats to Sizer's son and a report of "shots fired." While Officer Cameron admits she learned "something about shots being fired into the ground," she explains she received no indication of how many shots were fired. Cameron Dep. at 151:14–16. Moreover, Plaintiffs have produced no evidence, such as the records from the officers' in-car computers or the full transcript of the conversation between the dispatcher and the officers, to support their assertion that Officer Cameron should have known only three shots were fired and they were all fired into the ground. Arguments by a nonmovant which amount to pure conjecture do not raise a genuine issue of material fact. Based on the record before it, the Court finds it was reasonable for the officers to suspect Sizer of a serious crime.

The second *Graham* factor—"whether the suspect poses an immediate threat to the safety of the officers or others"—likewise counsels in favor of the use of force. Having reviewed the

officers' dash cam videos of the encounter, the Court determines Sizer's resistance "was, at most, passive." *Deville*, 567 F.3d at 167. The videos reveal Sizer standing in front of Corporal Reale, largely unmoving, with both of his hands in front of his body. Moreover, Sizer's explanation as to why he could not comply with the officers' orders—that he was physically disabled—is audible.

Still, the Court is mindful that the calculus of reasonableness depends on the totality of the circumstances as viewed by a reasonable, on-the-scene officer without the benefit of retrospection. *Poole*, 691 F.3d at 628. Officer Cameron testified she viewed the situation as presenting two threats: a threat to the officers' safety, and a threat to Sizer's son, who Officer Cameron believed needed life-saving medical assistance.

The Court finds Officer Cameron possessed an objective and reasonable belief that Sizer posed an immediate threat to their safety. As noted, both officers reasonably suspected Sizer of a serious crime, and they were on notice that Sizer had warned the dispatcher he was "armed and ready for anything." Moreover, as they approached Sizer, they noticed his shirt was untucked, obscuring his waistband from view. In her deposition, Officer Cameron testified APD trains its officers that the waistband is the main area subjects stow their guns, and in the past, she had disarmed subjects with guns concealed in their waistbands under an untucked shirt.

Furthermore, it is undisputed that Sizer failed to comply with the officers' repeated commands to get on the ground. After Sizer failed to heed Corporal Reale's eleven commands to get down, Corporal Reale instructed Officer Cameron to "go lethal and I'll go hands on." Officer Cameron testified she interpreted his direction to "go lethal" as an indication that Corporal Reale believed Sizer was still armed, because otherwise he would not have instructed her to switch from her taser to her lethal weapon. Cameron Dep. at 35:4–6; *see Batiste v. Theriot*, 458 F.

20

App'x 351, 354 (5th Cir. 2012) (describing a taser as a "non-lethal weapon" even where the suspect died). Indeed, Corporal Reale's testimony confirms Officer Cameron's understanding; Corporal Reale explained that given the report of "shots fired" and Sizer's threat to his son, he could not eliminate the possibility that a weapon could be produced at any time.

Plaintiffs argue that, despite her testimony to the contrary, Officer Cameron did in fact hear Sizer claim he could not comply with the officers' orders because he was disabled. But Officer Cameron explained in her deposition that even if she had heard Sizer's claim, it would not have changed her response given the nature of the threats reported and his non-compliance with the officers' verbal commands. Officer Cameron testified APD trains its officers that "subjects will say anything to avoid arrest," and Officer Cameron observed that Sizer could walk, stand unaided, and based on her knowledge of his 311 and 911 calls, she knew Sizer was able to fire a gun.

Moreover, "[k]nowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public[.]" *Bates ex rel. Johns v. Chesterfield Cty., Va.*, 216 F.3d 367, 372 (4th Cir. 2000). Officer Cameron responded with measured force to what she perceived as a mounting threat to the officers. She deployed her taser only after Sizer failed to comply with the officers' commands and Corporal Reale indicated his intent to go "hands on," which Officer Cameron believed was too risky given the officers' concern Sizer was still armed. Under these circumstances, a reasonable officer would have perceived an "immediate threat" to the officers' safety warranting Officer Cameron's use of force.

The Court similarly finds Officer Cameron possessed an objective and reasonable belief that Sizer posed an immediate threat to his son's safety. Officer Cameron testified, "[s]aving the

son's life if the subject shot him as threatened was the number one priority." Cameron Decl. ¶ 24. Corporal Reale likewise testified, "the main concern was the son may be shot and in need of life-saving medical attention." Reale Decl. ¶ 18. The record reveals both Officer Cameron and Corporal Reale knew Sizer had threatened to shoot his son, and they knew they were responding to a report of "shots fired." The fact that Sizer was unarmed and his son was not injured (or even on the premises) is not the relevant inquiry. Rather, the Court must adopt the perspective of a reasonable, on-the-scene officer who is operating without the benefit of retrospection. Having done so, the Court concludes Officer Cameron's actions were objectively reasonable in light of the immediate threat she perceived Sizer posing to the officers and his son.

Finally, the Court notes the third *Graham* factor—"whether the suspect is actively resisting arrest or attempting to evade arrest by flight"—counsels against the use of force. As discussed above, Sizer displayed, at most, passive resistance and made no attempt to flee. Moreover, as Plaintiffs point out, APD's policy states a taser should not be used against "passively resisting subjects." Pls.' Mot. Summ. J. [#35-5] Ex. 21 (APD Taser Policy) at 7.

Yet the policy also states the taser may be used where there is a "reasonable expectation that it will be unsafe for officers to approach within contact range of the subject." *Id.* Officer Cameron testified she deployed her taser because she believed the risk posed by going "hands on" was too high. Given the Court's conclusion that a reasonable officer would suspect Sizer of committing a serious crime and would fear for her safety and that of others nearby, the Court finds Officer Cameron's use of force was neither clearly excessive nor objectively unreasonable.

### 2. Clearly Established Law

Even assuming a fact issue exists as to whether Officer Cameron used excessive force against Sizer in violation of the Fourth Amendment, the Court concludes Officer Cameron is

entitled to qualified immunity under the second prong of the analysis. "Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). The "central concept" of this second prong of the qualified immunity analysis is "fair warning," whether a reasonable official would understand the conduct in this case violated the Fourth Amendment. *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012). There need not be binding case law directly on point; even the *Graham* factors themselves can place an officer on notice. *Id.* at 764 (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

Though no binding case law is directly on point in this case, a review of Fifth Circuit cases involving taser deployment suggests an officer's use of force is justified where at least two of the *Graham* factors support the use of force. *See, e.g., Pratt*, 822 F.3d at 182; *Poole*, 691 F.3d 624, 629 (5th Cir. 2012) (affirming grant of summary judgment to officers where the plaintiff, who was pulled over during a traffic stop, verbally and physically resisted the officers and posed an immediate threat to their safety, and the officers reacted with "measured and ascending" actions to the plaintiff's escalating resistance); *Batiste*, 458 F. App'x at 355 (reversing denial of qualified immunity where it was reasonable for the officers to chase and taser a fleeing suspect with a felony arrest warrant). On the other hand, where none of the *Graham* factors counsel in favor of the officer's use of force, the Fifth Circuit has concluded a plaintiff's excessive force claim survives summary judgment. *See, e.g., Newman*, 703 F.3d at 762–63 (concluding the officers' tasing of the plaintiff was objectively unreasonable where the plaintiff was pulled over for a minor traffic stop, did not attempt to flee, and did not present a serious threat); *Massey v. Wharton*, 477 F. App'x 256, 263 (5th Cir. 2012) (affirming denial of qualified immunity to

officer who tased the plaintiff twice and pepper sprayed him, even though the plaintiff was not a threat to the officers, was not attempting to flee, and was driving away at the officer's command); *Autin*, 174 F. App'x at 185–86 (5th Cir. 2005) (affirming denial of qualified immunity where the officer tased a plaintiff multiple times and the plaintiff was, at most, committing the minor crime of criminal mischief, was not a threat to the officers or others, and was not resisting arrest).

As discussed above, at least two of the *Graham* factors counsel in favor of the force Officer Cameron used against Sizer. Though Sizer exhibited passive resistance, he was suspected of a serious crime and Officer Cameron reasonably believed he posed an immediate threat to the safety of the officers and his son. Thus, the *Graham* factors would not have put a reasonable officer on notice that deployment of her taser under these circumstances was unreasonable in light of clearly established law. Defendants' motion for summary judgment is therefore granted.

### ii. Bystander Liability Claim Against Corporal Reale

Plaintiffs allege Corporal Reale is liable under Section 1983 for failing to protect Sizer from Officer Cameron's use of excessive force. Though each state actor's conduct must be evaluated individually for purposes of Section 1983, a claim for "bystander liability" may be stated against an officer who did not personally act against the plaintiff. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). Bystander liability requires that the state actor: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id.* (quoting *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002)); *see also Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) ("[A]n officer who is present at the scene and does not take reasonable measures to protect

a suspect from another officer's use of excessive force may be liable under [S]ection 1983." (citing *Harris v. Chanclor*, 537 F.2d 203, 205–06 (5th Cir. 1976))).

"The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer." *Whitley*, 726 F.3d at 647 (quoting *Randall*, 302 F.3d at 204 n.24). In this case, the Court concludes Officer Cameron's use of force was not excessive and therefore did not violate Sizer's constitutional rights. Consequently, Plaintiffs' corresponding bystander liability claim based on whether Corporal Reale *knew* Officer Cameron was violating Sizer's constitutional rights fails. To the extent Plaintiffs assert a claim for supervisor liability against Corporal Reale for failing to prevent his subordinate—Officer Cameron—from engaging in unconstitutional conduct, that claim fails for the same reason their bystander liability claim fails.

In the alternative, even if Plaintiffs have shown a fact exists as to whether Officer Cameron violated Sizer's constitutional rights, the Court finds Corporal Reale is entitled to qualified immunity on Plaintiffs' bystander and supervisor liability claims. As noted, Sizer was suspected of a serious crime, and the officers reasonably believed he posed an immediate threat to their safety and the safety of his son. A reasonable officer would not have known his fellow officer was violating a clearly established right by deploying her taser under these circumstances.

### 2. Claims against the City

Plaintiffs also name the City as a defendant for their Section 1983 claims, alleging numerous theories of liability based on the County's failure to train, supervise, and discipline its officers, negligent retention of its officers, and failure to implement adequate policies governing the use of tasers. To establish their claims against the City, Plaintiffs must first prove the existence of a constitutional violation. *See City of L.A. v. Heller*, 475 U.S. 796, 799 (1986)

25

(concluding a plaintiff must first prove the existence of a constitutional violation in order to hold a municipality liable); *see also Valle v. City of Hous.*, 613 F.3d 536, 544 (5th Cir. 2010) (concluding "[t]he standard applicable to the failure-to-train claim is the same as the standard for municipal liability" and noting "the inadequate training policy" must be a "'moving force' in causing violation of the plaintiff's rights")). Because Plaintiffs have failed to show the individual officers' violated Sizer's constitutional rights, Plaintiffs' claims against the City are dismissed.

### 3. State Law Claims for Wrongful Death

Plaintiffs next contend Defendants are liable for Sizer's wrongful death under the Texas wrongful death statute, TEX. CIV. PRAC. & REM. CODE §§ 71.001 *et seq*. As an initial matter, Plaintiffs did not respond to Defendants' summary judgment arguments regarding their wrongful death claims, nor did they address these claims in their own motion for summary judgment. Plaintiffs' failure to pursue these claims beyond the complaint suggests they have abandoned them. *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (stating the plaintiff "failed to defend her retaliatory abandonment claim in both responses to the defendant's motion to dismiss" and concluding "[h]er failure to pursue this claim beyond her complaint constituted abandonment"); *White Buffalo Ventures, LLC v. Univ. of Tex. at Austin*, No. A-03-CA-296-SS, 2004 WL 1854168, at *2 n.3 (W.D. Tex. Mar. 22, 2004) (concluding the plaintiff abandoned its claim where it did not respond to the defendant's summary judgment motion challenging that claim, nor did it address the claim in its own motion for summary judgment).

Even if the claims have not been abandoned, however, the Court lacks jurisdiction to hear Plaintiffs' wrongful death claim against the City. The essence of Plaintiffs' claim is that Officer Cameron used excessive force in tasing Sizer. "Such a claim sounds in intentional tort." *Saenz v. City of El Paso*, 637 F. App'x 828, 830 (5th Cir. 2016) (considering the plaintiff's claim for

excessive force based the officers' "handcuffing, shackling, tasing, shooting and killing" of the decedent). Though the Texas Tort Claims Act (TTCA) waives sovereign immunity for municipal governments in certain circumstances, the waiver does not extend to intentional torts. *See* TEX. CIV. PRAC. & REM. CODE § 101.057(2). To the extent Plaintiffs seek to avoid this bar by pleading negligence, the Fifth Circuit has held "[a] plaintiff may not maintain a negligence claim under the TTCA where the claim is based on 'the same conduct' as the intentional tort claim." *Saenz*, 637 F. App'x at 831 (quoting *Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580 (Tex. 2001)); *see, e.g., Holland v. City of Hous.*, 41 F. Supp. 2d 678, 713 (S.D. Tex. 1999) ("Where the essence of a claim under the TTCA arises from an intentional tort, allegations of negligence are insufficient to avoid the § 101.057 exception to liability.").

Having dismissed all of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining wrongful death claim against the individual officers. *See* 28 U.S.C. § 1367(c)(3) (stating that district courts "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); *Rhyne v. Henderson Cty.*, 973 F.2d 386, 395 (5th Cir. 1992) (concluding the district court properly dismissed the plaintiff's state law claim because it had previously dismissed "all of the federal questions that gave it original jurisdiction"). Defendants' motion for summary judgment on Plaintiffs' state law claims for wrongful death is therefore granted.

### Conclusion

Having viewed the facts in the light most favorable to Plaintiffs, the Court finds Defendants are entitled to summary judgment on all of Plaintiffs' claims. Plaintiffs' motion for summary judgment is therefore denied.

Accordingly,

IT IS ORDERED that Defendants' Motion for Leave to File Defendants' Second Amended Answer [#36] is GRANTED;

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment [#58] is GRANTED;

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment [#35] is DENIED;

IT IS FURTHER ORDERED that Defendants' Motion to Strike Plaintiffs' Summary Judgment Evidence [#46] and their Motion to Strike Plaintiffs' Summary Judgment Response Evidence [#67] are DISMISSED IN PART and DENIED IN PART as described in this opinion;

IT IS FURTHER ORDERED that Defendants' Opposed Motion for Leave to File Sealed Document [#43] is DENIED;

IT IS FURTHER ORDERED that Defendants' Motion to Compel Discovery from Retained Expert [#33] is DISMISSED AS MOOT; and

IT IS FINALLY ORDERED that Defendants' Motion to Exclude Expert Opinions and Testimony of George L. Kirkham [#34] is DISMISSED AS MOOT.

SIGNED this the ___/st___ day of June 2017.


_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE